UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIET R. SINGH, *Plaintiff,* *v.* UNITED STATES OF AMERICA, *Defendant.* | No. 1:25-cv-00056-AMD-TAM<br>District Judge Ann M. Donnelly<br>Magistrate Judge Taryn A. Merkl |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General, Tax Litigation Branch

*/s/ Daniel M. Caves*
DANIEL M. CAVES
Trial Attorney
Civil Division, Tax Litigation Branch
U.S. Department of Justice
P.O. Box 55
Washington, D.C. 20044
202-514-6058 (v) | 202-514-5238 (f)
Daniel.M.Caves@usdoj.gov

Of Counsel:

JOSEPH NOCELLA, JR.
U.S. Attorney

## TABLE OF CONTENTS

Table of Authorities ........ i

Reply Memorandum of Law ........ 1

I. The Plaintiff's Refund Claim is Untimely Regardless of Section 7508A(d)........ 1

A. Statutory background ........ 1

B. The plain and literal text of Section 7508A(d) did not trigger a 3.5-year extension of the plaintiff's deadline to file her refund claim ........ 4

1. The *Kwong* court fatally misread the applicable statute ........ 6

C. Congress' 2021 amendment clarified its intent for a limited mandatory extension period 9

D. Even if *Kwong* controls, the Court lacks jurisdiction to grant the plaintiff's refund under 26 U.S.C. § 6511(b)(2) ........ 11

II. The IRS Did Not Waive the Plaintiff's Statutory Duty to Duly File a Valid Refund Claim.12

III. The Plaintiff's July 25, 2019 Letter is Not a Valid Informal Refund Claim and Her Untimely Form 1040X Does Not Relate Back. ........ 13

Conclusion ........ 15

# Table of Authorities

## Cases

*Abdo v. Comm'r*, 162 T.C. 148 (2024) ... 9

*Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758 (2021) ... 12

*Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022) ... 8

*Borenstein v. Comm'r*, 919 F.3d 746 (2d Cir. 2019) ... 13

*Comm'r v. Lundy*, 516 U.S. 235 (1996) ... 13

*Jones v. Hendrix*, 599 U.S. 465 (2023) ... 6

*Kwong v. United States*, 179 Fed. Cl. 382 (2025) ... 7, 8, 11

*Magnone v. United States*, 733 F. Supp. 613 (S.D.N.Y. 1989) ... 17

*Malkin v. United States*, No. 97 CIV. 9125 WK, 2000 WL 37996 (S.D.N.Y. Jan. 14, 2000), *aff'd*, 243 F.3d 120 (2d Cir. 2001) ... 14

*McMillan v. IRS,* No. 09-CV-577, 2010 WL 3804895 (E.D.N.Y. Sept. 23, 2010) ... 16

*Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023) ... 8

*Porto v. Seltzman*, No. 89 CIV. 7945 (JFK), 1990 WL 26293 (S.D.N.Y. Mar. 5, 1990) ... 17

*Rivera-Perez v. Stover*, 171 F.4th 196 (2d Cir. 2026) ... 6

*United States v. Bettan*, No. 15CV5204SJFAKT, 2020 WL 1989286 (E.D.N.Y. Apr. 27, 2020) 14

*United States v. Janis*, 428 U.S. 433 (1976) ... 14

*Weisman v. Comm'r*, 103 F. Supp. 2d 621 (E.D.N.Y. 2000) ... 16

## Statutes

26 U.S.C. § 6404(b) ... 13

26 U.S.C. § 7508 ... 2

26 U.S.C. § 7508A (2019) ... 1, 3, 5

26 U.S.C. § 7508A (2021) ... 9

26 U.S.C. § 7508A (2025) ........................................................................................ 4, 11

*Economic Growth and Tax Relief Reconciliation Act of 2001*, Pub. L. 107-16, Title VIII, § 802(a) 115 Stat. 149 ........................................................................................ 2

*Emergency Economic Stablization – Emergency Improvement and Extension – Tax Extenders and Alternative Minimum Tax Relief*, Pub. L. 110-343, Div. C, Title VII, § 706(a)(2)(D)(vii), 122 Stat. 3922 ........................................................................................ 2

*Further Consolidated Appropriations Act, 2020*, Pub. L. 116-94, Div. Q, Title II, § 205(a), 133 Stat. 3245 ........................................................................................ 2

*Infrastructure Investment and Jobs Act*, Pub. L. 117-58, Div. H, Title V, §§ 80501(a), 80504(a), (b)(1), 135 Stat. 1335, 1336 ........................................................................................ 3, 4

*Taxpayer Relief Act of 1997*, Pub. L. 105-34, Title IX, § 911(a), 111 Stat. 877 ........................... 2

*Victims of Terrorism Tax Relief Act of 2001*, Pub. L. 107-134, Title I, § 112(a), 115 Stat. 2433 .. 2

<u>OTHER AUTHORITIES</u>

CDC.GOV, CDC Museum COVID-19 Timeline, https://www.cdc.gov/museum/timeline/covid19.html, https://perma.cc/TX9D-S288 ............... 3

H.R. 3301, H. Rept. No. 116-379 (2020)........................................................................................ 8

S. 3931, 119th Cong. § 1004 (2026)........................................................................................ 11

<u>REGULATIONS AND ADMINISTRATIVE GUIDANCE</u>

*Major Disaster Declarations and Related Determinations: Expiration of COVID-19 Related Measures*, 88 F.R. 8884-1, 2023 WL 1862867 ........................................................................ 3

*New York; Major Disaster and Related Determinations*, 85 F.R. 20702-01, 2020 WL 1848136 . 3

*Proclamation 9994-declaring A National Emergency Concerning the Novel Coronavirus Disease (covid-19) Outbreak*, 2020 WL 12861857 ........................................................................ 3

*Tennessee Severe Storms, Tornadoes, Straight-line Winds, and Flooding*, FEMA-DR-4476-TN 8

*Tropical Storm Isaias*, FEMA-DR-4567-NY ........................................................................8

## Reply Memorandum of Law

The plaintiff Juliet Singh's opposition to the United States' motion to dismiss fails to show that the IRS understood that a refund claim was being made when she sent the agency her letter dated July 25, 2019, or that the IRS's Letter 916C dated September 19, 2022, explicitly telling the plaintiff that she did not file a refund claim, shows that the IRS waived the formal requirement of a duly filed refund claim. The plaintiff also attempts to flip the presumption of correctness afforded to IRS tax assessments and records on its head and improperly shift the burden onto the United States in this refund suit. The plaintiff also raises a new argument not pleaded in her complaint, but which is an issue of first impression that would moot the issues above: that the COVID-19 pandemic triggered a colossal three-and-a-half-year extension of time under 26 U.S.C. § 7508A(d) for her to file a refund claim. This argument is grounded in the flawed decision of the Court of Federal Claims in *Kwong v. United States* that ignored the plain text of that statute as it applied before November 15, 2021, when Congress amended the statute and clarified how subsection (d) was intended to operate.[1] *Kwong*'s flawed reading of the statute should not be followed in this case. The United States hereby submits the following reply in further support of its motion to dismiss for lack of jurisdiction.

### I. The Plaintiff's Refund Claim is Untimely Regardless of Section 7508A(d)

#### A. Statutory background

In some form since at least the 1950s, the Secretary of the Treasury has been empowered by statute to extend the time for military servicemembers to perform certain time-sensitive acts under the Internal Revenue Code ("IRC") if they are deployed in a combat zone or are otherwise

[1] Given the importance of the section 7508A argument to this case and to tax administration generally, the Court has granted the plaintiff leave to file a sur-reply limited to that issue alone. *See* Text Order dated March 27, 2026, Granting United States' Motion for Extension of Time and Leave to File Excess Pages for its Reply.

occupied by their service to the nation. *See* 26 U.S.C. § 7508. Congress enacted a similar statute in 1997 to allow civilians affected by a Presidentially declared disaster to gain the same benefit for a period of up to 90 days, empowering the Treasury Secretary to "prescribe regulations" to carry out the process. *Taxpayer Relief Act of 1997*, Pub. L. 105-34, Title IX, § 911(a), 111 Stat. 877. Amendments in 2001, 2002, 2008, and 2018, expanded the statute's reach and refined its procedures. For instance, the 2001 amendment placed the authority to invoke 7508A directly with the Treasury Secretary and expanded the period that could be disregarded to "up to 120 days." *Economic Growth and Tax Relief Reconciliation Act of 2001*, Pub. L. 107-16, Title VIII, § 802(a) 115 Stat. 149. The 2002 amendment increased the period that could be disregarded from 120 days to up to one year and included taxpayers affected by "terroristic or military action[s]." *Victims of Terrorism Tax Relief Act of 2001*, Pub. L. 107-134, Title I, § 112(a), 115 Stat. 2433. In 2008, Congress changed "Presidentially declared" to "federally declared" and borrowed that term's meaning from the then-current 26 U.S.C. § 165(h)(3)(C), and in 2018 Congress changed that cross-reference to the current § 165(i)(5)(A). *Emergency Economic Stablization – Emergency Improvement and Extension – Tax Extenders and Alternative Minimum Tax Relief*, Pub. L. 110-343, Div. C, Title VII, § 706(a)(2)(D)(vii), 122 Stat. 3922. In each version of the statute, the operation of Section 7508A(a) depended on the Secretary issuing a notice specifically referring to the relevant disaster declaration, defining the scope of those affected, and specifically extending certain deadlines by specific periods, limited by the statute to one year.

In 2019, Congress amended the statute again, adding a new provision: subsection (d), which provided for a "mandatory 60-day extension" for qualified taxpayers regardless of whether they fall within the sweep of a specific notice issued by the Secretary. *Further Consolidated Appropriations Act, 2020*, Pub. L. 116-94, Div. Q, Title II, § 205(a), 133 Stat.

3245. If a taxpayer qualifies (usually by living in a federally declared disaster zone), then a period spanning from "the earliest incident date *specified in the [disaster] declaration*" to "60 days after the latest incident date *so specified*" would be disregarded "in the same manner as a period specified under subsection (a)." 26 U.S.C. § 7508A(d) (2019) (emphases added).

When Congress codified Section 7508A(d) on December 20, 2019, disasters were generally confined in scope, area affected, and length of time. But unbeknownst to Congress, COVID-19 was taking root in Wuhan, China, and soon would sweep the globe. *See* CDC.GOV, CDC Museum COVID-19 Timeline, https://www.cdc.gov/museum/timeline/covid19.html, https://perma.cc/TX9D-S288 (noting the first confirmed diagnoses of COVID-19 on December 12, 2019). On March 13, 2020, after the ensuing global pandemic reached the United States, the President determined under section 501(b) of the Stafford Act (42 U.S.C. §§ 5121 *et seq.*) that the pandemic was a nationwide major disaster. *Proclamation 9994-declaring A National Emergency Concerning the Novel Coronavirus Disease (covid-19) Outbreak*, 2020 WL 12861857. The Federal Emergency Management Agency ("FEMA") issued a notice on April 14, 2020, giving notice of the President's follow-up declaration of March 20, 2020, declaring the State of New York a disaster zone as of January 20, 2020. *New York; Major Disaster and Related Determinations*, 85 F.R. 20702-01, 2020 WL 1848136. The disaster continued, officially, until May 11, 2023, when FEMA issued another notice on February 10, 2023, announcing that the disaster would officially end on May 11 of that year. *See Major Disaster Declarations and Related Determinations: Expiration of COVID-19 Related Measures*, 88 F.R. 8884-1, 2023 WL 1862867.

In the meantime, Congress amended the statute again in November 2021. *See Infrastructure Investment and Jobs Act*, Pub. L. 117-58, Div. H, Title V, §§ 80501(a), 80504(a),

(b)(1), 135 Stat. 1335, 1336. Among other major changes, subsection (d) was amended to clarify the mechanics of the mandatory extension to account explicitly for open-ended disaster declarations like the COVID-19 declaration. *Id.* § 80501(a). Rather than the mandatory extension period being bookended by the first and last incident dates specified in a single declaration, the extension period under the new amendment begins on "the earliest incident date specified in the declaration" regarding the disaster area and ends "60 days after the later of such earliest incident date . . . or the date such declaration was issued." Thus, the mandatory extension would necessarily be limited in time and not eclipse the Secretary's statutory authority under subsection (a): for example, under the 2021 amendment, the mandatory extension period would run from January 20, 2020—the first incident date specified in the President's declaration—until May 12, 2020, which is sixty days after that declaration. Congress would amend the statute again in 2025, recodifying the mandatory extension as subsection (e) and increasing the period from 60 days to 120 days. *See* 26 U.S.C. § 7508A (2025) (as amended).

**B. The plain and literal text of Section 7508A(d) did not trigger a 3.5-year extension of the plaintiff's deadline to file her refund claim**

Statutory interpretation begins and ends with the statute's plain text, "giving the statutory terms their ordinary or natural meaning." *Rivera-Perez v. Stover*, 171 F.4th 196, 201 (2d Cir. 2026). But statutory provisions must not be read in isolation—rather, a court must interpret the whole statute "as a symmetrical and coherent regulatory scheme[] and fit, if possible, all parts into an harmonious whole." *Id.* at 203 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)); *see also Jones v. Hendrix*, 599 U.S. 465, 478 (2023) ("Basic principles of statutory interpretation require that we construe the [two provisions] in harmony, not set them at cross-purposes."). Thus, § 7508A(d) as it existed in 2019 must be read in the context of the

whole statute, and especially with subsection (a)'s general provision, at the very least. The 2019 statute read, in relevant part:

> **(a) In general.**--In the case of a taxpayer determined by the Secretary to be affected by a federally declared disaster (as defined by section 165(i)(5)(A)) or a terroristic or military action (as defined in section 692(c)(2)), *the Secretary may specify a period of up to 1 year* that may be disregarded in determining, under the internal revenue laws, in respect of any tax liability of such taxpayer—
>
> > **(1)** whether any of the acts described in paragraph (1) of section 7508(a) were performed within the time prescribed therefor (determined without regard to extension under any other provision of this subtitle for periods after the date (determined by the Secretary) of such disaster or action),
> > **(2)** the amount of any interest, penalty, additional amount, or addition to the tax for periods after such date, and
> > **(3)** the amount of any credit or refund.
>
> [. . . .]
>
> **(d) Mandatory 60-day extension.**--
>
> > **(1) In general.**--In the case of any qualified taxpayer, the period—
> >
> > > **(A)** beginning on the *earliest incident date specified in the declaration* to which the disaster area referred to in paragraph (2) relates, and
> > > **(B)** ending on the date which is 60 days after the *latest incident date so specified*,
>
> shall be disregarded *in the same manner as a period specified under subsection (a)*.

26 U.S.C. § 7508A(a), (d) (emphases added). Crucial to understanding the correct operation of the statute as it existed from 2019 to 2021 is subsection (d)'s emphasis on dates being specified in a relevant disaster declaration, and on the extension operating "in the same manner as . . . subsection (a)." *Id.* The plain language of subsection (d) did not require that a disaster declaration contain separate, unique dates. Rather, the statute referred explicitly to the "earliest incident date specified in the declaration," and the "latest incident date so specified." Congress's

choice of language thus reflects an intent for the 60-day extension period to be anchored to dates contained in a single disaster declaration.

### 1. The *Kwong* court fatally misread the applicable statute

The plaintiff, in relying on the *Kwong* court, is wrong by reading subsection (d) in a vacuum without regard to its overall context and by ignoring the statute's explicit reference to the "latest incident date *so specified*." The holding in *Kwong* thus created a disharmonious, asymmetrical, and incoherent regulatory scheme that Congress could not have intended, and which should not apply here. In *Kwong v. United States*, the government moved for summary judgment to dispose of a taxpayer's refund suit because it was filed more than two years after the IRS mailed the taxpayer his claim disallowance notice. 179 Fed. Cl. 382, 384–85 (2025). All relevant dates occurred during the COVID-19 pandemic and before the 2021 clarifying amendment, and the taxpayer argued that based on that federally declared disaster, section 7508A(d) postponed his deadline from January 20, 2020, through July 10, 2023, which was sixty days after the May 11, 2023 end date noted above. *Id.* at 386–87. The court agreed, ignoring the plain language of the statute that anchors the mandatory extension to the earliest and latest incident dates "so specified" in the relevant disaster declaration. *See id.* at 385–86 (dismissing United States' argument in court-ordered supplemental briefing regarding the "last incident date so specified" as a "moving target"). The *Kwong* court completely omitted the phrase "so specified" and its implications in its ruling, holding instead that "[t]he 2019 version of the statute allows the period of automatic extension to run from 'the earliest incident date' of the disaster declaration to '60 days after the latest incident date.'" *Id.* at 387. Full stop.

Notably missing from this holding is the statutory phrase "so specified." Rather than giving the plain language of the statute its full effect and reading subsection (d) in its full context, the *Kwong* court effectively rewrote the statute by disregarding Congress's requirement

that the mandatory extension be calculated with reference to the earliest and latest dates *specified* in the relevant declaration, which can be the same date or the date of the declaration if no "latest incident date" is "so specified." Neglecting that vital term "eviscerate[s] . . . significant aspects of the statutory text," which courts should hesitate to do. *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 737 (2022); *see also Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 441 (2023) (court should "ordinarily aim to 'giv[e] effect to every clause and word of a statute'") (quoting *Microsoft Corp. v. i4i L.P.*, 564 U.S. 91, 106 (2011)). The court emphasized the declaration's use of "continuing," but that is quite literally not a date that can be "so specified" in the triggering declaration.

*Abdo v. Comm'r*, upon which *Kwong* purported to rely, did not require *Kwong*'s incorrect and anomalous result because the Tax Court did not reach how section 7508A(d) should be calculated regarding the COVID-19 declaration. Instead, the Tax Court held that the mandatory extension was self-executing and required nothing more than a Stafford Act declaration. 162 T.C. 148, 169 (2024) (taxpayer entitled to "automatic 60-day postponement period starting from January 20, 2020 . . . to at least March 20, 2020, to file their [Tax Court] petition"). The *Abdo* deadline fell within the statutorily mandated extension period of sixty days from the January 20, 2020 incident date, while *Kwong* went far further and did so on a flawed and incomplete reading of the statute.

Additionally, since its inception in 2019, the heading of the relevant subsection has been a "mandatory 60-day extension," evincing an intent to have subsection (d) be limited in time and scope—no more than 60 days in addition to what any taxpayer who falls into the sweep of a notice issued by the Secretary under subsection (a) could legally expect. Thus, a postponement period cannot dwarf the Secretary's authority under subsection (a) in the way that the *Kwong*

court so held because the mandatory extension under subsection (d) operates "in the same manner as a period specified under subsection (a)." The *Kwong* court's misreading of the 2019 statute turned a 60-day postponement period into a 1,267-day postponement period, far beyond anything that the Secretary has ever had the statutory authority to do and far beyond Congress's intent in having subsection (d) operate "in the same manner" as subsection (a).

The *Kwong* court and the plaintiff's reading of the 2019 statute also thwarts Congress's overall intent in adding subsection (d). Congress's goal in adding a mandatory 60-day postponement period was to provide certainty to taxpayers affected by disasters outside their control. The House Ways and Means Committee explained that it "believe[d] that the certainty and additional time provided by an automatic extension of filing deadlines for taxpayers affected by federally declared disasters will ease the burden of tax compliance for taxpayers dealing with the hardship of disaster recovery." H.R. 3301, H. Rept. No. 116-379 at 99 (2020). Relying on the date, or dates, contained in one disaster declaration, provides that certainty by allowing taxpayers to know both the beginning and the end of the mandatory postponement period based on one relevant declaration. Suggesting that taxpayers should wait for an indefinite disaster to come to an official end to know whether they missed any of their tax deadlines for the preceding three years is a Kafkaesque uncertainty that Congress would not have intended to impose on the public. But that is precisely the situation that the *Kwong* holding creates, not only for taxpayers during the COVID-19 pandemic, but also for taxpayers living under open-ended disaster declarations that still, to this date, have not been formally closed. *See, e.g.*, *Tropical Storm Isaias*, FEMA-DR-4567-NY; *Tennessee Severe Storms, Tornadoes, Straight-line Winds, and Flooding*, FEMA-DR-4476-TN.

### C. Congress' 2021 amendment clarified its intent for a limited mandatory extension period

Congress made its intent crystal clear in 2021 when it amended the statute yet again. Its most sweeping change was to remove actions required of the IRS from the effect of the mandatory extension period, limiting its application to "any of the acts described in subparagraphs (A) through (F) of section 7508(a)(1)." 26 U.S.C. § 7508A(d) (2021). In this amendment, the IRS's time to assess, to give notice and demand for payment, and to collect administratively and judicially, were written out of the extension's sweep. This ensured that the intended effect of subsection (d) from its inception—to provide certainty to taxpayers—was carried out faithfully by ensuring that the benefit inured solely to taxpayers. To have intended anything else would have ground all tax administration to a halt for the entirety of the COVID-19 pandemic.

The amendment also changed section 7508A(d)(1)(B) to read "ending on the date which is 60 days after the later of such earliest incident date described in subparagraph (A) or the date such declaration was issued." The amendment thus also clarified that the length of the mandatory postponement cannot run for more than the one-year limit that Congress has imposed on the Treasury Secretary for postponements under subsection (a) by anchoring the extension to one of two dates certain to be included in a disaster declaration: the incident date, and the declaration date itself. This allowed not only for the mandatory extension to apply prospectively in every future declaration, even if the incident date happens well before the date that a declaration was issued but also clarified how subsection (d) was meant to operate with an open-ended declaration. Had Congress believed that the operation of subsection (d) could potentially run indefinitely, it could have made the amendment retroactive, which it did not.

In contrast, the *Kwong* decision makes the opposite inference: since Congress did not make the amendment retroactive, it thus must have blessed an indefinite extension for taxpayers. *See Kwong*, 179 Fed. Cl. at 388 ("That Congress had to amend the statute implies that Congress changed the statute's meaning; otherwise, Congress could have left the statute's text as it was."). Such a reading would run afoul of the major questions doctrine, under which courts must "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 764 (2021). If Congress ever intended to give constituent agencies of the Executive branch like FEMA the power to grind tax administration to a halt by issuing an open-ended disaster declaration that indefinitely suspends tax filing deadlines, then Congress could have done that. On the contrary, the only explicit grant of departmental authority that Congress wrote into the statute is the limited authority given to the Treasury Secretary under section 7508A(a). Under the *Kwong* reading of the 2019 version of section 7508A, the Secretary can only postpone tax deadlines by one year while the FEMA Director could do so indefinitely. This Court should be wary to join the *Kwong* court in interpreting the statute in such a way as to give the FEMA Director vastly more power over the federal tax system than the Treasury Secretary.

Thus, given the President's March 13, 2020 disaster declaration and a proper construction of the 2019 version of section 7508A, the only date specified in the declaration was January 20, 2020. That would have created a mandatory postponement date until March 20, 2020, which is 60 days after the only "incident date so specified." Under a proper construction of section 7508A(d), the plaintiff's Form 1040X filed in October 2022 was still untimely.

**D. Even if *Kwong* controls, the Court lacks jurisdiction to grant the plaintiff's refund under 26 U.S.C. § 6511(b)(2)**

If this Court agrees with *Kwong*, a technically timely Form 1040X filed in October 2022 would still not grant the Court jurisdiction to grant the plaintiff's refund. That is because section 6511(b)(2) limits any refund for taxes to either a three-year lookback period, plus any applicable extensions (if a timely claim was filed), or a two-year lookback period (if an untimely claim was filed). Section 7508A only expanded its reach to this provision in 2025 when Congress amended the statute and added a new provision where "[f]or purposes of section 6511(b)(2)(A), any period disregarded under this section with respect to time for filing any return of tax shall be treated as an extension of time for filing such a return." 26 U.S.C. § 7508A(f) (2025).[2] As has been well established by the record, the plaintiff paid the tax on June 14, 2018. There is no ambiguity that section 7508A never reached section 6511(b)(2) until the 2025 amendment. Thus, no extension or postponement under the statute would apply. Accordingly, the lapse in time between that payment and her Form 1040X would still deprive this Court of jurisdiction to grant the refund since that payment was more than three years before she filed her refund claim. *See Comm'r v. Lundy*, 516 U.S. 235, 239–45 (1996); *Borenstein v. Comm'r*, 919 F.3d 746, 751–52 (2d Cir. 2019).

Since the 2019 version of Section 7508A(d) did not make the plaintiff's Form 1040X timely, the only way for her to rescue her untimely refund claim is under the waiver doctrine and the informal claim doctrine. As explained below, the plaintiff has failed to carry her burden on those issues as well.

---

[2] The current version of the statute contains two subsection (f)s, of which the cited provision is the second. The first subsection (f) codified the meaning of "significant fire" under the statute. Congress has proposed legislation to recodify the provision affecting section 6511(b)(2)(A) as subsection (g). *See* S. 3931, 119th Cong. § 1004 (2026).

## II. The IRS Did Not Waive the Plaintiff's Statutory Duty to Duly File a Valid Refund Claim.

Contrary to the plaintiff's conclusory assertions, the IRS transcripts and correspondence with the plaintiff do not show the clear evidence necessary to establish that the waiver doctrine applies. At the outset, the plaintiff tries to flip the presumption of correctness on its head and shift the burden impermissibly to the United States in this refund suit. Tax assessments are entitled to a presumption of correctness unless the "the assessment is shown to be naked and without foundation." *United States v. Janis*, 428 U.S. 433, 442 (1976). That situation was the essence of *Janis*, *Betton*, and *Malkin*, on which the plaintiff improperly relies to shift the burden on the IRS. For instance, *Malkin* allowed the IRS to use an account transcript as secondary evidence to show that the taxpayer had submitted a Form 872-A, indefinitely extending the limitations period for assessment and which the taxpayer later disclaimed ever signing, even though the IRS's file had been erroneously destroyed. *Malkin v. United States*, No. 97 CIV. 9125 WK, 2000 WL 37996, at *1–3 (S.D.N.Y. Jan. 14, 2000), *aff'd*, 243 F.3d 120 (2d Cir. 2001). *Bettan* is also a routine application of this presumption: the IRS's transcripts, showing the assessment of taxes and penalties, were treated as prima facie evidence of liability that established the United States' entitlement to summary judgment on that issue without competent evidence from the taxpayer to undermine the IRS's calculations. *United States v. Bettan*, No. 15CV5204SJFAKT, 2020 WL 1989286, at *5 (E.D.N.Y. Apr. 27, 2020). Here, the plaintiff is not contesting the assessment of tax, nor is there any question on what it was based: the plaintiff's own tax 2017 tax return and a Form 1099 issued by her IRA servicer showing the withdrawals that led to the liability. The presumption of correctness does nothing for the plaintiff in this situation.

Also, the plaintiff's reading of the IRS's records in this case is what is incorrect, not the records themselves. What the record shows is that in July 2019 the plaintiff responded to an Automated Underreporter ("AUR") notice suggesting she underreported her income and proposing unpaid taxes and penalties and then followed up with a letter explaining why she should get "hardship" relief. That letter was forwarded to the AUR, where it was treated as a request for an abatement of her tax liability but not a refund claim, evidence by the IRS's 916C letter in September 2022 to clarify the plaintiff's error. *See* ECF No. 17-16 ("The law allows you to file a claim for a refund of taxes you have paid. However, the law doesn't allow you to file a claim to reduce the tax you owe."); 26 U.S.C. § 6404(b) ("No claim for abatement shall be filed by a taxpayer in respect of an assessment of any tax imposed under subtitle A or B."). She then filed a non-compliant and professionally prepared refund claim incorrectly by simply removing $100,000 from her reported income on her Form 1040X rather than claiming a theft loss deduction as she should have and to which she now argues she is entitled. The TXMOD further shows that the disallowance was based on an amended claim filed on October 19, 2022, without reference to her July 2019 correspondence. *See* ECF No. 16-8 at 1 (transaction code 290 dated August 21, 2023, in reference to "AMD-CLMS-DT>10192022). The disallowance was also based solely on the untimeliness of the claim because, as the plaintiff admits in her amended complaint, "the IRS never investigated the substance of [her] refund claim." ECF No. 13 ¶ 51. There was thus no waiver by the IRS.

### III. The Plaintiff's July 25, 2019 Letter is Not a Valid Informal Refund Claim and Her Untimely Form 1040X Does Not Relate Back.

The plaintiff's last refuge is the informal claim doctrine, which similarly fails. The United States has not argued that the informal claim doctrine requires specific citations to the IRC, as the plaintiff suggests. Rather, the plaintiff's July 25, 2019 letter to the IRS shows that

she was requesting relief because of an alleged financial "hardship." Plaintiff's reliance on the informal claim doctrine asks the Court to find that that was enough information from which the IRS might have deduced that she sought a refund based on a theft loss, but that is not enough. The cases that the plaintiff cites in support of her argument involve letters that were far more explicit than in this case. The taxpayer in *Weisman v. Comm'r* made it clear that "it is [his] contention that not only [does he] not owe any taxes, but [he is] owed a refund" in a cover letter attached to his Form 1040. 103 F. Supp. 2d 621, 628 (E.D.N.Y. 2000) (quoting the taxpayer's letter). The taxpayer in *McMillan v. IRS* sent a letter where he was adamant that "his disability pension had been improperly taxed as earned income" between tax years 1983 and 2009 despite already having paid tax when it was deposited in his pension fund. No. 09-CV-577, 2010 WL 3804895, at *1 (E.D.N.Y. Sept. 23, 2010). The informal claim in *Porto v. Seltzman* "was filed on an IRS 'Claim' form" and, while not specifying a basis for a refund beyond noting that the IRS's position was "totally arbitrary, capricious and without foundation in basis or fact," the court held that this made it clear "'that a right is being asserted with respect to an overpayment of tax.'" No. 89 CIV. 7945 (JFK), 1990 WL 26293, at *3 (S.D.N.Y. Mar. 5, 1990) (quoting *Newton v. United States*, 163 F. Supp. 614, 618 (Ct. Cl. 1958)). And the court in *Magnone v. United States* rejected the taxpayer's refund suit under the variance doctrine without reaching the informal claim doctrine. 733 F. Supp. 613, 618 (S.D.N.Y. 1989) ("Even assuming, arguendo, that [the informal claim] doctrine applies to this case, the claim—even if informal—still must sufficiently apprise the IRS of enough facts and legal theories to prevent surprise in the later civil suit."). The plaintiff's request for hardship relief "due to hardship and . . . due to a different tax bracket" is not enough to have put the Secretary on notice that she wanted a refund based on a theft loss deduction.

The plaintiff's Form 1040X was also deficient and is not a duly filed claim for refund, even if her letter was an informal claim. As explained in the United States' opening brief, one does not request a theft loss deduction by simply declaring that specific Form 1099 income is untaxable and then omitting it from the return altogether. *See* ECF No. 16-1 at 11 (PageID.187). The plaintiff itemized her deductions in both her original return and on her untimely Form 1040X, the latter of which was professionally prepared, and never claimed the theft loss deduction on Line 20 or Schedule A. Given that the IRS understood the July 2025 letter to be an improper request for an abatement of tax and not a refund claim, failing to claim the theft loss deduction properly on her actual purported refund claim could not have fairly put the IRS on notice that she wanted the refund on those grounds. The plaintiff's intent and the IRS's understanding were two ships passing in the night. That does not trigger the informal claim doctrine and her untimely and non-compliant 2022 refund claim does not relate back to her July 2019 letter.

## CONCLUSION

For the foregoing reasons, this case should be dismissed for lack of jurisdiction.

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General,
Tax Litigation Branch

*[/s/ Daniel M. Caves]*
DANIEL M. CAVES
Trial Attorney
Civil Division, Tax Litigation Branch
U.S. Department of Justice
P.O. Box 55
Washington, D.C. 20044
202-514-6058 (v) | 202-514-5238 (f)
Daniel.M.Caves@usdoj.gov

Of Counsel:

JOSEPH NOCELLA, JR.
U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document on April 29, 2026, with the Clerk of the Court using the Court's CM/ECF system, which will electronically serve all registered parties.

*/s/ Daniel M. Caves*
DANIEL M. CAVES
Trial Attorney
Civil Division, Tax Litigation Branch