UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JULIET R. SINGH**, Plaintiff, – against – **UNITED STATES OF AMERICA**, Defendant. | **MEMORANDUM DECISION AND ORDER** 25-CV-56 (AMD) (TAM) |

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this action against the United States of America, seeking a refund of $30,601 in federal income taxes for the 2017 tax year, as well as statutory interest. (ECF No. 13 at 10.) The government moves to dismiss the complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that the plaintiff is prohibited from filing a refund suit, because she did not file an administrative refund claim within the three-year limitations period defined in 28 U.S.C. § 6511(a). (ECF No. 16-1 at 5 (citing 26 U.S.C. § 7422).) The Court held oral argument on the government's motion on June 30, 2026. (*ECF Minute Entry dated June 30, 2026*; *see also* ECF No. 24, Transcript of June 30, 2026 Oral Argument ("Oral Arg. Tr.").) As explained below, the motion to dismiss is denied.[1]

[1] The parties are attempting to negotiate a settlement, but the government appears to be investigating the details of the scam that led to the plaintiff's loss. (*See* ECF No. 26.) As of August 26, 2026, the government was waiting to hear back from the New York City Police Department and the Secret Service. (*Id.* ¶ 3.) A Secret Service agent told the government that "she recalls the plaintiff's case and that there are documents," but "she must confirm whether she can produce those documents informally or if a formal subpoena will be required." (*Id.*)

## BACKGROUND

In October 2017, the plaintiff was the victim of an online dating scam. (ECF No. 13 ¶¶ 7–8.) The fraudster persuaded her to withdraw $100,000 from her Individual Retirement Account ("IRA") and transfer it to him, ostensibly to pay for his mother's medical care. (*Id.* ¶¶ 7–8.) Once she sent him the money, he stopped responding to her messages, and she realized that she had been defrauded. (*Id.* ¶¶ 9–11.) She reported the crime to the New York City Police Department ("NYPD") and the United States Secret Service, but they could not identify the perpetrator or recover her money. (*Id.* ¶¶ 12–21.) On April 11, 2018, the plaintiff filed a timely federal income tax return for the 2017 tax year. (*Id.* ¶ 22.) The tax code allows taxpayers to claim deductions for certain losses that insurance does not cover, including losses due to theft. *See* 26 U.S.C. § 165. However, the plaintiff did not claim a theft loss deduction on her 2017 tax return. (*See* ECF No. 13 ¶¶ 22–23.) She reported her $100,000 IRA withdrawal as income and paid the resulting tax liability, which amounted to $28,069.74 after withholding. (*Id.* ¶¶ 22–23.) This amount included a 10% early withdrawal penalty. (*Id.* ¶ 29; *see also* ECF No. 16-3 at 1–2.)

On July 15, 2019, the IRS's Holtsville, New York office sent the plaintiff an audit notice, called a Notice CP2000, through the IRS's Automated Underreported ("AUR") system. (ECF No. 13 ¶ 24; *see also* ECF No. 17-3.) It stated that she had failed to report $10,700 of her IRA withdrawal and therefore owed $4,547 on her 2017 tax return, plus interest. (ECF No. 13 ¶ 24; ECF No. 17-3 at 2, 4.) On July 21, 2019, the plaintiff sent a letter to the Holtsville office, with the subject line, "RE: NOTICE CP2000, TAX YEAR 2017, NOTICE DATE 7/15/2019, AUR CONTROL NUMBER 50032-2368." (ECF No. 16-4 at 1.) Attaching copies of her brokerage statements from Fidelity, she stated that she did not owe income tax on the $10,700 withdrawal, because she repaid the amount to her IRA within the tax code's 60-day rollover period. (*Id.* at 1–

15; *see also* ECF No. 16-1 at 17 (citing 26 U.S.C. § 408(d)).) The IRS stamped the letter as received by its Holtsville office on July 31, 2019 and by "AUR-BSC" on August 1, 2019. (ECF No. 16-4 at 1–2.)

On July 25, 2019, the plaintiff sent a letter to the IRS's office in Kansas City, Missouri, with the subject line, "RE: TAX YEAR 2017 – TO WAIVE THE 10% PENALTY DUE HARDSHIP I ENDURED FROM AN EARLY IRA WITHDRAWAL AND TAXES I PAID DUE TO HUGE TAX BRACKET." (ECF No. 16-4 at 16.) The letter stated in part:

> I am seeking hardship relief since I endured tax amount of $27,604.00 plus interest of $465.74 which totals $28,069.74 of which I borrowed money to pay the IRS on 06/14/2018 due to daily compounding interest. In addition, I paid 10% penalty due to two early withdrawals in 2017 from my Fidelity IRA. . . . Unfortunately, I was a victim of an online dating scam and was scammed my entire savings and my IRA account. I reached out to the NYC police to recover my losses and was unsuccessful. The NYC police could not find this online dating scammer . . . . Please let me know your decision to waive the 2017 10% penalty due to hardship and the 2017 huge tax paid due to a different tax bracket.

(*Id.* (cleaned up).) She also provided the NYPD case number and the investigating officer's contact information. (*Id.*) The IRS stamped the letter as received by "KCSP – Deposit" on August 1, 2019, by "ACS Support" on August 2, 2019, and by "ICT-KC" on August 9, 2019. (*Id.*)

IRS records reflect that the plaintiff called the IRS on July 26, 2019. (ECF No. 16-6 at 1.) The IRS agent noted that the plaintiff "disagrees with assessment, [is] sending documentation to AUR [department] regarding balance, also looking for hardship, but did not want to discuss IA or CNC options, [taxpayer] will write letter to service center." (*Id.* (cleaned up).) On August 1, 2019, the IRS noted in the plaintiff's account within its Integrated Data Retrieval System ("IDRS") that an "[a]mended tax return or claim" was "forwarded" to the "Underreporter" "for processing." (ECF No. 16-3 at 1; ECF No 16-8 at 1; *see also* ECF No. 16-

7 ¶¶ 2–3 (explaining the IDRS transaction codes).) It is not clear whether the IRS forwarded the July 21, 2019 letter, the July 25, 2019 letter, or both letters.

On November 18, 2019, the IRS sent the plaintiff a letter informing her that it had closed its audit of her 2017 return without charging any additional tax (ECF No. 17-5 at 2); the IRS entered a corresponding note in IDRS on December 2, 2019 (ECF No. 16-3 at 1).

The plaintiff states that from 2020 through early 2023, she called the IRS "about once a month" about her July 25, 2019 letter. (ECF No. 17-1 ¶ 30.) She alleges that IRS's phone lines were so busy that she only reached a live agent on a "few occasions." (*Id.*) The agents told her that the COVID-19 pandemic and limited in-office staffing had delayed the IRS's response to her claim. (*Id.*) These calls are not listed in the IRS records the government submitted to the Court. (*See* ECF No. 16-6.) The plaintiff also asserts that she sent follow-up letters about her theft loss to the IRS's Kansas City office on August 9, 2021, August 16, 2021, August 31, 2021, May 11, 2022, May 30, 2022, and June 20, 2022. (ECF No. 17-1 ¶¶ 31, 33.) The letters all had subject lines like "RE: Early withdrawal IRS hardship refund as per 2017 income tax." (ECF Nos. 17-7, 17-8, 17-9, 17-12, 17-13, 17-14.) The August 9, 2021, August 16, 2021, August 31, 2021 letters reiterated that a "con artist" took $100,000 from her and included the relevant case number and contact information for the Secret Service. (ECF Nos. 17-7, 17-8, 17-9.) The May 11, 2022, May 30, 2022, and June 20, 2022 letters asked for a response to the plaintiff's earlier correspondence. (ECF Nos. 17-12, 17-13, 17-14.) The government states that IRS records reflect only that the agency received letters dated May 11, 2022 and June 20, 2022, on July 5, 2022. (ECF No. 16-2 ¶ 5.)

While the IRS's records do not capture all of the calls and letters that the plaintiff claims to have made or sent from 2021 to 2023, it appears that the agency communicated with the

plaintiff during that time. The plaintiff received two letters from the IRS's Kansas City office, dated September 24, 2021 and December 14, 2021, which stated that they were responding to her September 16, 2021 and December 6, 2021 "correspondence," "telephone inquiry," or other outreach. (ECF Nos. 17-10, 17-11.) The September 24, 2021 letter referred to the Form 1040 for the December 31, 2008 tax period (ECF No. 17-10 at 2), while the December 14, 2021 letter referred to the Form 1040 for the December 31, 2017 tax period (ECF No. 17-11 at 2).[2] In both letters, the IRS referred to its review of her case; the letters said in part: "Before we can resolve this matter, we need to process all of your information. We'll send you our complete response within 90 days. We don't need any further information from you right now." (ECF No. 17-10 at 2; ECF No. 17-11 at 2.)

On August 24, 2022, the IRS sent the plaintiff another letter, this time from Fresno, California, which referred to her "inquiry of July 5, 2022" about the December 31, 2017 tax period. (ECF No. 17-15 at 2.) It said, "We're working on your account. However, we need an additional 60 days to send you a complete response on what action we are taking on your account. We don't need any further information from you right now." (*Id.*) The plaintiff finally received a substantive response from the IRS on September 19, 2022. (ECF No. 17-16 at 3.) The letter specified that the plaintiff had submitted a claim for $10,700 on July 25, 2019, for the December 31, 2017 tax period. (*Id.*) It stated the following:

> The law allows you to file a claim for a refund of taxes you have paid. However, the law doesn't allow you to file a claim to reduce the tax you owe. If you disagree with the amount of tax you owe, you can appeal our decision. To appeal our decision, you must:
>
> - Pay the tax you owe.

[2] It appears that the plaintiff wrote "incorrectly entered 2008 instead of 2017" on the September 24, 2021 letter. (ECF No. 17-10 at 2.)

> - File an amended return with documentation that supports a reduction in the tax you owe.
>
> - File your claim for refund within 3 years from the date you filed your return or 2 years from the date you paid your tax, whichever is later.

(*Id.*)

In response, the plaintiff filed a Form 1040X, Amended U.S. Individual Tax Return, for the 2017 tax year on October 7, 2022, which the IRS received on October 19, 2022. (ECF No. 16-4 at 24–45.) The plaintiff did not claim a theft loss deduction on the form; instead, she removed the $100,000 from her taxable income, requested a refund of $30,601, and stated that the "1099-R," or IRA withdrawal, "should not be taxed" in the "Explanation of Changes" section. (*Id.* at 29–30.) However, her cover letter explained:

> I was involved in an online con artist fraud that involved the Secret Service and NYS Police. I lend a con artist scammer $100,000 from my 401k plan who pretended and suggested that he will pay me back because his Mom was very ill. So I lend him money from my 401k plan who never pay me back. I was scammed. I was under extreme stress, ashamed, and very hurt so I reached out to NYPD who couldn't located him. I then contacted Secret Service who couldn't find him either and was told that money was gone.
>
> I then wrote many letters to IRS for hardship since I never receive the $100,000 back to put in the 401k plan and only now got a response from IRS to send in an amended 2017 Tax Return (1040X). . . .
>
> Now that the IRS responded after such a long time and only now suggested that I submitted an amended 2017 return. Please mail the refund check to the above address.

(*Id.* at 27.) On the same day — October 19, 2022 — the IRS also stamped the plaintiff's August 16, 2021 letter as received. (*Id.* at 28.) The letter said in part:

> I am writing to seek help from the IRS due to tremendous hardship experienced in October 2017 into 2018.

> I sincerely hope you understand and reimburse me the extra tax paid plus the 10% penalty for early withdrawal from IRA for 2017 income taxes. . . .
>
> I filed a loss of money report with the NYPD and the United States Secret Service. This is regarding case #108813306802. The Special Agent is Abigail J. Tyrrell is assigned to my case who is located in the New York Field Office . . . .
>
> Attached are my IRA monthly statements for Sept 2017, Oct 2017, and Nov 2017 reflecting early withdrawal of $100,000 in October 2017. The **<u>con artist took my money</u>** and now I realized it is lost forever so I am seeking help from the IRS. . . .
>
> I would like you to reimburse me the extra tax I paid for 2017 income tax and the 10% early withdrawal penalty from the IRA account since I never receive[d] the money **<u>because I was conned.</u>**

(*Id.* (emphasis in original).) The letter also included the special agent's contact information. (*Id.*) In response, the IRS sent the plaintiff five letters, dated November 25, 2022, January 24, 2023, March 28, 2023, May 31, 2023, and August 1, 2023, which acknowledged receipt of her October 19, 2022 inquiry, but stated that the IRS needed 60 more days to respond. (ECF Nos. 17-18, 17-19, 17-20, 17-21, 17-22.)

In an August 15, 2023 letter, the IRS denied the plaintiff's claim. (ECF No. 17-23 at 3.) The IRS explained that it could not allow the plaintiff's claim for "income and tax reduction," because she filed on October 19, 2022, more than 3 years after she filed her 2017 tax return. (*Id.*) According to IRS, the last day for the plaintiff "to file a timely claim or return for the tax year 2017 was May 17, 2021." (*Id.*) The plaintiff attempted to appeal the decision to the IRS's Office of Appeals on August 9, 2024 and February 5, 2025. (ECF No. 16-4 at 55–61.) She filed this action on March 27, 2025, seeking a refund of $30,601, plus statutory interest. (*See* ECF Nos. 1, 13.)

## LEGAL STANDARD

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (citation omitted). "[A] defendant is permitted to make a fact-based Rule 12(b)(1) motion," proffering evidence beyond the pleadings, as the government does here. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). "In opposition to such a motion, the plaintiff[] will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Id.* (quoting *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)). "If there are disputed jurisdictional fact issues, the court must consult evidence outside the pleadings." *Hilton v. United States*, No. 24-CV-7363, 2025 WL 3620980, at *1 (E.D.N.Y. Dec. 15, 2025) (citation modified), *appeal filed*, No. 26-333 (2d Cir. Feb. 13, 2026); *see also Molokotos-Liederman v. Molokotos*, No. 23-CV-1654, 2023 WL 5977655, at *5 (S.D.N.Y. Sept. 14, 2023) ("[I]n resolving a Rule 12(b)(1) motion, 'a district court . . . may refer to evidence outside the pleadings.'" (quoting *Makarova*, 201 F.3d at 113)). But "if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to" show subject matter jurisdiction, a plaintiff is "entitled to rely on the allegations" in the complaint. *Carter*, 822 F.3d at 57.

## DISCUSSION

"The doctrine of sovereign immunity bars federal courts from hearing all suits for monetary damages against the federal government, including federal agencies like the IRS, unless sovereign immunity has been waived." *Humphrey v. IRS*, No. 22-1052, 2022 WL 17728194, at *1 (2d Cir. Dec. 16, 2022) (summary order); *see also Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983) ("The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress."). The United States has broadly consented to tax-refund suits; concurrent with the United States Court of Federal Claims, district courts have original jurisdiction to hear "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." 28 U.S.C. § 1346(a).

However, "Congress has placed several conditions on a taxpayer's right to maintain a refund suit, including a requirement that the taxpayer satisfy the applicable statute of limitations by filing a timely administrative claim." *AmBase Corp. v. United States*, 731 F.3d 109, 118 (2d Cir. 2013). Before suing for a tax refund, a taxpayer must "duly file," 26 U.S.C. § 7422, a claim with the IRS on the proper form that "set[s] forth in detail each ground upon which a . . . refund is claimed and facts sufficient to apprise the Commissioner [of Internal Revenue] of the exact basis thereof," 26 C.F.R. § 301.6402-2(a)–(c); *see also* 26 U.S.C. § 7422 ("No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax . . . until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."); 26 CFR

§ 301.6402-3 (defining specific rules for income tax refund claims). The administrative claim must be filed "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later." 26 U.S.C. § 6511(a); *see also AmBase Corp.*, 731 F.3d at 118 (discussing Section 6511(a)).

The government argues that the Court lacks subject matter jurisdiction to decide the plaintiff's refund claim, because she did not file a timely or proper administrative claim and, therefore, Congress has not waived the United States's sovereign immunity with respect to her suit. (ECF No. 16-1 at 5.) There is no dispute that the plaintiff filed a timely federal income tax return for the 2017 tax year in mid-April 2018 and paid her tax liability on June 14, 2018. (ECF No. 13 ¶¶ 22–23; ECF No. 16-1 at 14.) Under 26 U.S.C. § 6511(a), the plaintiff's deadline to file an administrative refund claim was in April 2021, three years after she filed her return. (*See* ECF No. 16-1 at 14.) According to the government, the plaintiff did not file a refund claim until the IRS received her amended tax return for 2017 on October 19, 2022 — after the three-year limitations period had expired. (*Id.*) Moreover, the government argues the amended tax return was not a "duly filed" refund claim, because it "fails to state the legal and factual basis for the refund," as the regulations require. (*Id.* at 15.)

The plaintiff responds that there are three different exceptions that make her administrative claim timely and duly filed. (*See* ECF No. 17 at 12–27.) First, under the waiver doctrine, by processing the July 25, 2019 letter as a refund claim, the IRS acknowledged the letter as such and waived the right to object to the claim's form. (*Id.* at 12–16.)[3] Second, under

[3] There are four judicially recognized exceptions to the requirement that taxpayers must file an administrative claim that formally complies with applicable regulations before suing for a refund: the informal claim doctrine, the general claim doctrine, the germaneness doctrine, and the waiver doctrine. *See Martti v. United States*, 121 Fed. Cl. 87, 100–04 (2015); *see also AmBase Corp.*, 731 F.3d at 118 ("While taxpayers may file a formal claim for a refund . . . informal claims have long been recognized

the informal claim doctrine, the plaintiff's July 25, 2019 letter tolled the plaintiff's deadline to file a claim that complied with the technical requirements of 26 C.F.R. §§ 301.6402-2 and 301.6402-3. (*Id.* at 16–22.) Third, the plaintiff's October 19, 2022 was timely, because, under 26 U.S.C. § 7508A, filing deadlines were automatically extended for the duration of the COVID-19 pandemic — from January 20, 2020 to July 10, 2023. (*Id.* at 23–26.)

As explained below, pursuant to either the informal claim doctrine or the mandatory extension provision of Section 7508A, the plaintiff's claim was "timely" and "duly file[d]."

## I. Waiver Doctrine

Under the waiver doctrine, if the IRS "investigate[s] the merits of a timely claim, despite its technical defects," as though it were a formal claim, the IRS "waives [its] right to insist upon compliance with IRS procedures" and technicalities. *Zeeman v. United States*, 395 F.2d 861, 869 (2d Cir. 1968) (citing *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 297–98 (1945)). "Where the doctrine applies, three requirements must be met for waiver to be found: (1) the IRS must have 'investigated the merits of [the refund] claim'; (2) the IRS must have 'taken action' on the claim; and (3) the IRS's determination to 'dispense with' the regulatory requirements and to examine the merits of the claim must be 'unmistakable.'" *Gregory v. United States*, 149 Fed. Cl. 719, 723 (2020) (quoting *Angelus Milling Co.*, 325 U.S. at 298); *see also Angelus Milling Co.*, 325 U.S. at 298 ("[I]t is not essential for the establishment of a waiver that the Commissioner communicate his ruling on the merits to the taxpayer. But in the absence of such explicitness the implication that formal requirements were dispensed with should not be tenuously argumentative."). "The central purpose of the waiver doctrine is 'to prevent IRS agents from

as valid claims." (citation modified)). The parties agree that only the waiver doctrine and the informal claim doctrine are relevant here. (ECF No. 16-1 at 13; ECF No. 17 at 12–18.)

lulling taxpayers into missing the [limitations] deadline.'" *Computervision Corp. v. United States*, 445 F.3d 1355, 1366 (Fed. Cir. 2006) (quoting *BCS Fin. Corp. v. United States*, 118 F.3d 522, 526 (7th Cir. 1997)).

The waiver doctrine does not apply. The Court's inquiry is not how the IRS *should* have processed the plaintiff's claim. Moreover, it is not enough for the plaintiff to show that the IRS merely processed her claim. Rather, "[t]o prove a waiver occurred, plaintiff would have to demonstrate that actions taken by IRS representatives indicate that the IRS understood plaintiff's claims to be claims for *refund* and unmistakably dispensed with the formal requirements and examined the claims." *Martti*, 121 Fed. Cl. at 102 (emphasis added); *see also Hilton*, 2025 WL 3620980, at *2–4; *Rock v. United States*, 279 F. Supp. 96, 99–100 (S.D.N.Y. 1968); *Clark v. United States*, 149 Fed. Cl. 409, 413–14 (2020); *Dixon v. United States*, 147 Fed. Cl. 469, 477 (2020).

The plaintiff has not shown that the IRS "unmistakabl[y]" understood her July 25, 2019 letter to be a refund claim. She argues that the IRS must have processed it as a such, because her account transcript includes transaction code "971," "[a]mended tax return claim forwarded for processing," on August 1, 2019 — the date the IRS received her July 25, 2019 letter. (ECF No. 17 at 14.) However, the IRS stamped both her July 21, 2019 and July 25, 2019 letters on August 1, 2019. (ECF No. 16-4 at 1–2, 16.)[4] And the transaction codes are inconclusive. There are two entries for August 1, 2019 in the IDRS TXMOD transcript, one coded "971," and the other coded "977." (ECF No. 16-8 at 1.) It is not clear whether the entries correspond to the July 21, 2019 letter (her response to the audit), the July 25, 2019 letter (her refund request), or both. The

[4] The July 21, 2019 letter was stamped as received by "AUR-BSC," while the July 25, 2019 letter was stamped as received by "KCSP – Deposit." (ECF No. 16-4 at 1–2, 16.)

government argues that IRS must have processed her July 21, 2019 response to the audit on August 1, 2019, because "971" is accompanied by the code the code "015," which refers to the "Underreporter," the IRS's automated auditing system. (ECF No. 16-1 at 19–20; *see also* ECF No. 16-8 at 1.) The government does not address what the "977" entry means. (Oral Arg. Tr. 18:5-12.)

Additionally, the IRS's September 19, 2022 response letter does not "unmistakabl[y]" relate to a refund claim. The letter is illogical. It purports to address "claims received" on July 25, 2019. (ECF No. 17-16 at 3.)[5] However, it lists the "amount of claims" as $10,700 (*id.*), which was the amount at issue in the plaintiff's July 21, 2019 letter about the audit (ECF No. 16-4 at 1), not her July 25, 2019 letter. The plaintiff's July 25, 2019 letter claimed $28,069.74 (*id.* at 16), and, according to the IRS's own records, it resolved the plaintiff's $10,700 claim in 2019 — three years earlier. (ECF No. 16-3 at 1; ECF No. 17-5 at 2.) Substantively, the letter said, "The law allows you to file a claim for a refund of taxes you have paid. However, the law doesn't allow you to file a claim to reduce the tax you owe." (ECF No. 17-16 at 3.) This suggests that the IRS thought that it was responding to a request to reduce the plaintiff's existing tax liability, not for a refund of taxes that she already paid.

Therefore, the IRS did not waive the formal filing requirements for refund claims, because it never "unmistakabl[y]" interpreted the plaintiff's July 25, 2019 letter as a refund claim.

---

[5] In other IRS correspondence, "date of claims received" refers to the date that the IRS processed the letter, not the date that the plaintiff mailed the letter. (*See* ECF No. 17-23 (referring to claim received on October 19, 2022).)

## II. Informal Claim Doctrine

*United States v. Kales* recognized the informal claim doctrine. 314 U.S. 186, 194 (1941). "[A] notice fairly advising the Commissioner of the nature of the taxpayer's claim, which the Commissioner could reject because [it is] too general or because it does not comply with formal requirements of the statute and regulations, will nevertheless be treated as a claim where formal defects and lack of specificity have been remedied by amendment filed after the lapse of the statutory period." *Kales*, 314 U.S. at 194. "Informal claims have three components: (1) they must provide the IRS notice of the taxpayer's claim to a refund; (2) they must 'describe the legal and factual basis for the refund;' and (3) they must have a written component." *AmBase Corp.*, 731 F.3d at 118 (quoting *New Eng. Elec. Sys. v. United States*, 32 Fed. Cl. 636, 641 (1995)). In short, "a satisfactory informal claim must at least alert the IRS that the taxpayer seeks a refund and must also indicate the grounds upon which the taxpayer's claim is based." *United States v. Forma*, 42 F.3d 759, 767 n.13 (2d Cir. 1994) (citations omitted); *see also Computervision Corp.*, 445 F.3d at 1364 ("Under the informal claim doctrine, a timely claim with purely formal defects is permissible if it fairly apprises the IRS of the basis for the claim within the limitations period.")

After timely filing an initial, informal claim, a taxpayer must "perfect" her filing by submitting a formal claim. *Special Touch Home Care Servs., Inc. v. United States*, No. 20-CV-3051, 2022 WL 673660, at *7 (E.D.N.Y. Mar. 7, 2022); *see also Martti*, 121 Fed. Cl. at 101. In doing so, "a taxpayer may make an amendment that relates back to the prior claim, provided that 'the facts upon which the amendment is based would necessarily have been ascertained by the commissioner in determining the merits of the original claim.'" *AmBase Corp.*, 731 F.3d at 118 (quoting *St. Joseph Lead Co. v. United States*, 299 F.2d 348, 350 (2d Cir. 1962)). However, "[a] 'claim seeking refund upon one asserted fact situation may not be amended out of time so as to

require an investigation of matters not germane to the original claim.'" *Id.* (quoting *Weisbart v. Dep't of Treasury*, 222 F.3d 93, 98 (2d Cir. 2000), *abrogation on other grounds recognized by In re WorldCom, Inc.*, 723 F.3d 346, 357–58 (2d Cir. 2013)).

**a. The July 25, 2019 Letter Was an Informal Claim**

The plaintiff's July 25, 2019 letter was a valid informal claim. First, the letter clearly satisfies the doctrine's "written component" requirement. *See id.*[6] Second, although the letter does not use the word "refund," it put the IRS on notice that the plaintiff was requesting one. *See id.*; *see also Newton v. United States*, 163 F. Supp. 614, 618 (Ct. Cl. 1958) ("The purpose of a claim for refund is to put the Commissioner on notice that a right is being asserted with respect to an overpayment of tax . . . ." (citation modified)). The letter unequivocally asked the IRS to "waive" the $28,069.74 penalty that she paid "on 06/14/2018." (ECF No. 16-4 at 16.) A refund is the only way the IRS can "waive" a penalty that a taxpayer has already paid. (*See id.* at 24 ("The law allows you to file a claim for a refund of taxes you have paid. However, the law doesn't allow you to file a claim to reduce the taxes you owe.").) Therefore, the only reasonable interpretation of the plaintiff's letter is that she was requesting a refund. *See McMillan v. IRS*, No. 09-CV-577, 2010 WL 3804895, at *1 (E.D.NY. Sept. 23, 2010) ("Although [the taxpayer] did not use the word 'refund,' the only reasonable construction of his letter is as a request for refunds for tax years since 1983 and an assurance that his pension would not be improperly taxed in the future."); *Porto v. Seltzman*, No. 89-CV-7945, 1990 WL 26293, at *3 (S.D.N.Y. Mar. 5, 1990) ("Although his statement that '[t]he position of the IRS is totally arbitrary, capricious and without foundation or basis in fact' does not specify with clarity his reasons for challenging the

[6] The government does not dispute that the July 25, 2019 letter satisfies the written component requirement. (Oral Arg. Tr. 16:12-14.)

penalties, it does communicate to the IRS 'that a right is being asserted with respect to an overpayment of tax. . . .'" (quoting *Newton*, 163 F. Supp. at 618)).

Third, the plaintiff's letter "describe[d] the legal and factual basis for the refund." *AmBase Corp.*, 731 F.3d at 118. The government argues that the plaintiff's letter did not meet this requirement, because the plaintiff asked for relief due to "hardship" and never specifically asked for a theft loss deduction. (*See* ECF No. 16-1 at 18.) But the government does not provide any support for its argument that a taxpayer must refer to a deduction by its exact name to make an informal claim, and indeed, courts applying the doctrine have not set the bar that high. A valid informal claim must simply "indicate the grounds upon which the taxpayer's claim is based," *Forma*, 42 F.3d at 767 n.13, such that it "sufficiently apprise[s] the IRS of enough facts and legal theories to prevent surprise in the later civil suit," *Magnone v. United States*, 733 F. Supp. 613, 618 (S.D.N.Y. 1989). The plaintiff did not use the magic words "theft loss deduction," but it is clear that she was requesting one. Her letter said that she "was a victim of an online dating scam and was scammed [her] entire savings and [her] IRA account" and that she "reached out to the NYC police to recover [her] losses and was unsuccessful." (ECF No. 16-4 at 16.) She also provided the NYPD case number and investigating officer's contact information. (*Id.*) Therefore, the plaintiff's letter put the IRS on notice of the nature of her refund claim, making it a valid informal notice. *See Kales*, 314 U.S. at 194–196; *Weisman v. Comm'r*, 103 F. Supp. 2d 621, 628 (E.D.N.Y. 2000) (finding a valid informal claim where the plaintiff "made clear in his cover letter that he was basing his claim for a refund on the fact that he believed that [his employer] had actually withheld $9,175 in federal income tax from his pay but had never remitted that money to the IRS").

### b. The October 19, 2022 Form 1040-X Perfected the Informal Claim

The plaintiff's October 19, 2022 amended return and cover letter was a valid formal refund claim that perfected the plaintiff's informal claim.[7] To be "duly filed," a formal claim for an income tax refund must be filed on a Form 1040X and "set forth in detail each ground upon which a . . . refund is claimed and facts sufficient to apprise the [IRS] of the exact basis thereof" under penalty of perjury. 26 C.F.R. § 301.6402-2(a)–(c). The government argues that he plaintiff's October 19, 2022 Form 1040-X does not satisfy this standard, because it "merely says '1099-R should not be taxed,' while removing $100,000 from her income" and does not "claim any deduction on Line 20, which is for 'Casualty and Theft Losses.'" (ECF No. 16-1 at 15.)

However, for a taxpayer's formal claim to be valid, it "need only set forth facts in the claim sufficient to enable the IRS to make an intelligent review of the claim." *303 W. 42nd St. Enters., Inc. v. IRS*, 181 F.3d 272, 278 (2d Cir. 1999) (first citing *Scovill Mfg. Co. v. Fitzpatrick*, 215 F.2d 567, 568–69 (2d Cir. 1954); and then citing *Burlington N. Inc. v. United States*, 684 F.2d 866, 868 (Cl. Ct. 1982) (other citations omitted)).[8] The plaintiff did not strictly follow the

[7] A "formal amendment, if filed after the expiration of the limitations period, must be filed while the original claim is still being considered by the IRS" to effectively perfect an informal claim. *Computervision Corp.*, 445 F.3d at 1371–72. Accordingly, although the parties do not address the issue, the Court considers whether the IRS rejected the plaintiffs' July 25, 2019 informal claim in its September 19, 2022 letter to her. The Court finds that it did not. As discussed above, it is not clear whether in that letter the IRS was responding to the plaintiff's July 21, 2019 letter or her July 25, 2019 letter, and the substance of the IRS's response demonstrates that it was not rejecting a refund claim. (*See* ECF No. 17-16 at 3.)

[8] The government argues that "Ms. Singh's refund suit may be barred under the variance doctrine, even if her Form 1040X was considered a timely refund claim." (ECF No. 16-1 at 15.) Courts applying the variance doctrine have rejected taxpayers' claims where the taxpayer did not clearly state the factual basis for their refund request until after they filed suit. *See, e.g.*, *Carione v. United States*, 291 F. Supp. 2d 141, 148 (E.D.N.Y. 2003) ("[The administrative refund claim] failed to indicate that . . . he never had control or dominion over the proceeds of the sale. In other words, the grounds advanced in the Complaint as the basis for the claimed refund were omitted from the administrative refund claim."); *Pinckes v. United States*, 7 Cl. Ct. 570, 571 (1985) ("Plaintiff has submitted nothing to show that during the IRS investigation of his claim he asserted the existence of a partially worthless business debt."). The variance doctrine is not applicable here. The plaintiff's letters to the IRS, amended return, and

Form 1040X's directions; however, her submission considered as a whole, was sufficient to permit the IRS to review her claim. *303 W. 42nd St. Enters.*, 181 F.3d at 278. On the Form 1040X, the plaintiff requested a refund of $30,601, asserting that her "1099-R" — the IRS form associated with distributions from pensions, IRAs, and other retirement accounts — "should not be taxed." (ECF No. 16-4 at 29–30.) *See About Form 1099-R*, IRS, https://www. irs.gov/forms-pubs/about-form-1099-r. Consistent with the form's instruction to "[a]ttach any supporting documents and new or changed forms and schedules" (ECF No. 16-4 at 30), the plaintiff attached cover letters dated August 16, 2021 and October 7, 2022 (*id.* at 27–28), as well as her 2017 year-end statement from her Fidelity retirement account (*id.* at 40). The letters explained that the plaintiff's IRA distribution should not be taxed, because a "con artist scammer" took $100,000 from her "401k plan," and law enforcement could not recover the money. (*Id.* at 27–28.) She also provided the case number and investigating agent's contact information. (*Id.* at 28.) In this context, although the plaintiff did not claim a deduction on the correct line for "Casualty and Theft Losses," she "showed the actual happenings with reasonable precision, and the government taxing authorities could not have been misled by the trivial mislabeling." *Scovill Mfg. Co.*, 215 F.2d at 569–70.

At oral argument, the government claimed that the cover letters cannot form part of the plaintiff's formal claim, because a formal refund claim must be "under penalty of perjury, every part of it," and "[t]he cover letter is not part of the submission that is under penalty of perjury." (Oral Arg. Tr. 24:6-24.) This argument is meritless. First, when the plaintiff signed the October 19, 2022 Form 1040-X, she agreed as follows: "Under penalties of perjury, I declare that I have

---

complaint contain consistent, detailed descriptions of how she was defrauded. (*See* ECF No. 13, ECF No. 16-4 at 16, 28–30.)

filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete." (ECF No. 16-4 at 30.) Accordingly, by the plain terms of the Form 1040-X, the documents the plaintiff attached — including the cover letters — were submitted under penalties of perjury. Second, *Ambase Corporation* instructs that a refund claim must be evaluated in context with all of the taxpayer's communications with the IRS, as "[t]he focus is on the claim as a whole, not merely the written component." 731 F.3d at 120 ("Especially in light of AmBase's communications with the IRS regarding its decision to disaffiliate, we hold that the facts relating to AmBase's 2000 refund claim would necessarily have been ascertained upon consideration of the 1996 FDIC claim. We decline to give the FDIC claim a crabbed or literal reading, ignoring all the surrounding circumstances which give it body and content." (citation modified)). Here, the IRS "would necessarily have [] ascertained," *id.* at 118, the reason that the plaintiff's retirement account distributions "should not be taxed" (ECF No. 16-4 at 30), if it read the Form 1040-X and cover letters together.

Thus, the plaintiff made a valid formal refund claim on October 19, 2022, which perfected her July 25, 2019 informal claim.

## III. Filing Extension Under Section 26 U.S.C. § 7508A

Even assuming that the plaintiff's July 25, 2019 letter was not a valid informal refund claim, the plaintiff's October 19, 2022 formal claim was timely, because 26 U.S.C. § 7508A(d) (2019) extended her deadline to July 10, 2023.

### a. Overview of 26 U.S.C. § 7508A

26 U.S.C. § 7508A provides for a mandatory extension of certain tax-related deadlines in the event of a federally declared disaster. *See* 26 U.S.C. § 7508A. This includes the deadline for the "allowance of a credit or refund of any tax" and "filing a claim for credit or refund of any

tax." *See id.* (extending the deadlines for the "acts" described in 26 U.S.C. § 7508(a)(1)); *id.* § 7508(a)(1) (listing tax-related "acts" including "allowance of a credit or refund of any tax" and "filing a claim for credit or refund of any tax"). Congress has amended Section 7508A repeatedly — in December 2019, November 2021, July 2025, and December 2025. *Id.* § 7508A. The parties agree that the December 2019 version of the statute is applicable here. (ECF No. 17 at 24 n.64; ECF No. 20 at 9–10; ECF No. 22 at 4.) *See also Kwong v. United States*, 179 Fed. Cl. 382, 385 (2025) ("[T]he November 2021 amendment could not apply to the covid-19 disaster, which was declared in early 2020."), *appeal filed*, No. 26-1843 (Fed. Cir. May 20, 2026). The 2019 version of Section 7508A stated, in relevant part:

> **(a) In general.** In the case of a taxpayer determined by the Secretary to be affected by a federally declared disaster (as defined by section 165(i)(5)(A)) or a terroristic or military action (as defined in section 692(c)(2)), the Secretary may specify a period of up to 1 year that may be disregarded in determining, under the internal revenue laws, in respect of any tax liability of such taxpayer
>
> > **(1)** whether any of the acts described in paragraph (1) of section 7508(a) were performed within the time prescribed therefor (determined without regard to extension under any other provision of this subtitle for periods after the date (determined by the Secretary) of such disaster or action),
> >
> > **(2)** the amount of any interest, penalty, additional amount, or addition to the tax for periods after such date, and
> >
> > **(3)** the amount of any credit or refund. . . .
>
> **(d) Mandatory 60-day extension.**
>
> > **(1) In general.** In the case of any qualified taxpayer, the period
> >
> > > **(A)** beginning on the earliest incident date specified in the declaration to which the disaster area referred to in paragraph (2) relates, and
> > >
> > > **(B)** ending on the date which is 60 days after the latest incident date so specified,

> shall be disregarded in the same manner as a period specified under subsection (a). . . .
>
> **(5) Coordination with periods specified by the Secretary.** Any period described in paragraph (1) with respect to any person (including by reason of the application of paragraph (4)) shall be in addition to (or concurrent with, as the case may be) any period specified under subsection (a) or (b) with respect to such person.

26 U.S.C. § 7508A (citation modified). In brief, Section 7508A(a) "generally gives the Secretary of the Treasury [] or his delegate (i.e., the IRS) the discretion to postpone certain tax-related deadlines for up to one year for those taxpayers he or it determines to be affected by a federally declared disaster." *Abdo v. Comm'r*, 162 T.C. 148, 151 (2024). Conversely, Section 7508A(d)'s extensions are set based on federal disaster declarations, which the president issues pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("the Stafford Act"), 42 U.S.C. §§ 5121–5207. *See Abdo*, 162 T.C. at 155–56 (describing Section 7508A(d)).

**b. 26 U.S.C. § 7508A(d) Extended the Plaintiff's Deadline to July 10, 2023**

The plaintiff argues that under Section 7508A(d), federal disaster declarations related to the COVID-19 pandemic extended her deadline to file a formal tax refund claim to July 10, 2023. (ECF No. 17 at 24.) The president first declared a nationwide pandemic emergency on March 13, 2020. *See* Letter to Federal Agencies on an Emergency Determination for the Coronavirus Disease 2019 (COVID-19) Pandemic Under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 2020 Daily Comp. Pres. Doc. 159 (Mar. 13, 2020). On March 20, 2020, he declared a major disaster area in New York — where the plaintiff lives — "beginning on January 20, 2020, and continuing." New York; Major Disaster and Related Determinations, 85 Fed. Reg. 20702 (Apr. 14, 2020). The president's declaration did not specify the emergency's end date until it was amended by a February 10, 2023 notice, which stated that "the incident period for all COVID-19 major disaster declarations . . . will close effective May

11, 2023." Major Disaster Declarations and Related Determinations: Expiration of COVID-19-Related Measures, 88 Fed. Reg. 8884 (Feb. 10, 2023). Sixty days after May 11, 2023 is July 10, 2023. *See Kwong*, 179 Fed. Cl. at 388. The government responds that the text, structure, and context of the statute dictate that Section 7508A(d) only extended the deadline to 60 days after January 20, 2026 — March 20, 2020. (ECF No. 20 at 6–15.) None of the government's arguments are persuasive.

*i. "Latest Incident Date"*

Section 7508A(d)'s extension is applied "after the latest incident date so specified." 26 U.S.C. § 7508A(d). The government argues that because January 20, 2020 was the only date "so specified" in the March 20, 2020 disaster declaration, Section 7508A(d) could only have extended the deadline to March 20, 2020. (ECF No. 20 at 11.) It further argues that the Court should not give effect to the declaration's use of the phrase "and continuing," because it is "quite literally not a date that can be 'so specified.'" (*Id.* at 12 (quoting 26 U.S.C. § 7508A(d)).)

The latest incident date is May 11, 2023. The phrase "and continuing" is irrelevant, because the February 10, 2023 notice expressly "amend[ed] the notice of major disaster declarations and related determinations" such that "the incident period for all COVID-19 major disaster declarations and the nationwide emergency declaration will close effective May 11, 2023." 88 Fed. Reg. 8884. *Cf. Abdo*, 162 T.C. at 157 n.8 (discussing the February 10, 2023 notice); *Kwong*, 179 Fed. Cl. at 387 (same). Therefore, May 11, 2023 is the "latest incident date so specified." *See* 26 U.S.C. 7508A(d)(1)(B). But even if the Court did not consider the effect of this amendment, it would still find that the extension must be longer than 60 days after January 20, 2020. By its plain language, Section 7508A(d) defers to the disaster declaration to determine the length of the extension. "If the emergency declaration was intended to include only January 20, 2020, the declaration would not have also said, 'and continuing.' The

government's choice to maintain the disaster declaration beyond January 20, 2020, has meaning." *Kwong*, 179 Fed. Cl. at 388 (citation omitted).

*ii. "Mandatory 60-Day Extension"*

The government also argues that Section 7508A(d)'s heading — "mandatory 60-day extension" — limits the extension to 60 days after January 20, 2026, because it "evince[es] an intent to have subsection (d) be limited in time and scope." (ECF No. 20 at 12.) However, the "mandatory 60-day extension" heading refers to the mandatory minimum extension, not the maximum possible extension. In any event, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947) ("Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most gen[e]ral manner; to attempt to refer to each specific provision would often be ungainly as well as useless."); *see also* 26 U.S.C. § 7806(b) (providing that no "descriptive matter relating to the content of this title [shall] be given any legal effect"). Headings are strictly "'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen*, 331 U.S. at 529); *cf. Abdo*, 162 T.C. at 163 (discussing the significance of Section 7508A(d)'s "mandatory 60-day extension" heading). Here, there is no doubt to resolve. The plain text of the statute describes an extension that begins "on the earliest incident date specified in the declaration" and ends "60 days after the latest incident date so specified." 26 U.S.C. 7508A(d). Therefore, the postponement period lasts for duration of the disaster — however long that may be — plus 60 days.

*iii. "In the Same Manner"*

The government further claims that because Section 7508A(d) states that the mandatory period "shall be disregarded in the same manner as a period specified under subsection (a)," an

extension under Section 7508A(d) cannot be longer than Section 7508A(a)'s one-year maximum. (ECF No. 20 at 12–13.) The Court agrees with the *Abdo* and *Kwong* courts, which rejected similar arguments. *See Abdo*, 162 T.C. at 163–67; *Kwong*, 179 Fed. Cl. at 387–88 ("[T]he 'manner' in which the period is disregarded, discussed in subsection (a), is more evidently not the length of time but the types of actions that can be delayed, such as a taxpayer's determining amounts of interest and amounts of credit or refund."). As the *Abdo* court explained:

> To understand the requirement that the subsection (d) postponement period "shall be disregarded in the same manner as a period specified under subsection (a)," we necessarily look to section 7508A(a). Section 7508A(a) provides, in pertinent part: "In the case of a taxpayer determined by the Secretary to be affected by a federally declared disaster . . . , the Secretary may specify a period of up to 1 year that may be disregarded in determining . . . whether any of the acts described in paragraph (1) of section 7508(a) were performed within the time prescribed therefor." When we read the "shall be disregarded" language of subsection (d) in this context, the manner in which the subsection (d) postponement period must be treated becomes readily apparent. More specifically, the mandatory postponement period "shall be disregarded" "in determining, . . . whether any of the acts described in paragraph (1) of section 7508(a) were performed within the time prescribed therefor."

*Abdo*, 162 T.C. at 165.

A broader reading of the statute bolsters this interpretation. "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). Section 7508A(d)(5) provides that "[a]ny period described in [subsection (d)](1) with respect to any person . . . shall be in addition to (or concurrent with, as the case may be) any period specified under subsection (a) . . . with respect to such person." 26 U.S.C. § 7508A(d)(5). If the government's reading of the statute is correct — that extensions under subsections (a) and (d) are each capped at one year — it is not clear why Congress would provide that extensions under the two subsections should be added together. *See Abdo*, 162 T.C. at 166 ("We read the broad and

inclusive language of [subsection (d)(5)] to allow a mandatory extension described under section 7508A(d) to operate independently from any discretionary extension specified under section 7508A(a).").

Therefore, extensions under Section 7508A(d) are not limited to one year.

*iv. Significance of the 2021 Amendment*

In November 2021, Congress adopted several changes to Section 7508A. Most significantly, it amended Section 7508A(d) to limit the mandatory extension to the period "beginning on the earliest incident date specified in the [disaster] declaration" and "ending on the date which is 60 days after the later of such earliest incident date . . . or the date such declaration was issued." 26 U.S.C. § 7508A(d)(1) (2021). The government contends that this amendment "clarified how subsection (d) was meant to operate with an open-ended declaration," and the Court should interpret the 2019 version of the statute to share the same meaning. (ECF No. 20 at 14–15.) But "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. Immigr. & Naturalization Servs.*, 514 U.S. 386, 397 (1995). For the 2021 amendment to have "real and substantial effect," *id.*, the Court must interpret the 2019 version differently; "otherwise, Congress could have left the statute's text as it was." *Kwong*, 179 Fed. Cl. at 388. The government does not offer any evidence to support its theory that Congress believed the changes reflected the original intent of Section 7508A(d). In fact, the amendment expressly stated that it was not retroactive, as it "appl[ied] to federally declared disasters declared after the date of enactment of th[e] Act." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 80501, 135 Stat. 429, 1335 (2021); *see also Kwong*, 179 Fed. Cl. at 388 (discussing the 2021 amendment).

*v.* *Major Questions Doctrine*

Last, the government asserts that the plaintiff's and the *Kwong* court's reading of Section 7508A(d) would "run afoul" of the major questions doctrine, "under which courts must 'expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.'" (ECF No. 20 at 15 (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021)).) Pursuant to the "major questions doctrine," the Supreme Court has "expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 242 (2026) (quoting *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)). It applies where an executive agency asserts a "transformative expansion in its regulatory authority" or a "highly consequential power beyond what Congress could reasonably be understood to have granted" it. *West Virginia*, 597 U.S. at 721–24 (citation modified); *see also SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 283–84 (S.D.N.Y. 2024) (describing the major questions doctrine). The plaintiff responds that the doctrine does not apply here, because it "concerns agency exercises of discretionary power, not congressionally mandated statutory extensions." (ECF No. 22 at 9 n.8.)

This action does not implicate the major questions doctrine. Undoubtedly, given the length and scope of the COVID-19 pandemic, the impact of related disaster declarations on tax deadlines could be a question of "vast economic and political significance." *Ala. Ass'n of Realtors*, 594 U.S. at 764 (citations omitted). However, the plaintiff's interpretation of Section 7508A(d) would not require an "extraordinary delegation[] of Congress's powers." *Learning Res., Inc.*, 607 U.S. at 242. By its plain terms, Section 7508A(d) does not delegate any of Congress's powers; it is self-executing. The statute automatically grants taxpayers an extension by reference to the executive's authority to issue declarations that define the beginning and end of major disasters, *see* 26 U.S.C. § 7508A(d) — a power the executive has regularly exercised

since Congress enacted the Stafford Act in 1988, *see* 42 U.S.C. § 5170. This is not a "transformative expansion in [the executive's] regulatory authority," or a "highly consequential power beyond what Congress could reasonably be understood to have granted" it. *West Virginia*, 597 U.S. at 724.

**c. 26 U.S.C. § 6511(b)(2) Does Not Limit the Plaintiff's Refund**

The government argues that even if the Court agrees with the plaintiff's interpretation of Section 7508A(d), "a technically timely Form 1040X filed in October 2022 would still not grant the Court jurisdiction to grant the plaintiff's refund," because the plaintiff paid her tax liability more than three years earlier — on June 14, 2018. (ECF No. 20 at 16; *see also* ECF No. 13 ¶¶ 23; ECF No. 16-1 at 14.) As discussed above, 26 U.S.C. § 6511 governs "[c]laim[s] for credit or refund of an overpayment of any tax." 26 U.S.C. § 6511(a). According to the government, 26 U.S.C. § 6511(b)(2) "limits any refund for taxes to either a three-year lookback period, plus any applicable extensions (if a timely [refund] claim was filed), or a two-year lookback period (if an untimely [refund] claim was filed)." (ECF No. 20 at 16.)[9]

The government's argument is unpersuasive. Section 6511(b)(2)(A) provides, "If the claim was filed by the taxpayer during the 3-year period prescribed in subsection (a), the amount of the credit or refund shall not exceed the portion of the tax paid within the period, immediately preceding the filing of the claim, equal to 3 years plus the period of any extension of time for filing the return." 26 U.S.C. § 6511(b)(2)(A). However, Section 7508A provides that a postponement period under subsection (d) "shall be disregarded" "in determining, under the internal revenue laws, in respect of any tax liability of such taxpayer . . . the amount of any credit

[9] Section 6511(b)(2) does not deprive the Court of jurisdiction in any event, since the Court separately finds that the plaintiff filed a timely, valid informal refund claim.

or refund." 26 U.S.C. § 7508A(a), (d); *cf. Borenstein v. Comm'r*, 919 F.3d 746, 752 (2d Cir. 2019) (noting the "longstanding canon of construction that where the words [of a tax statute] are doubtful, the doubt must be resolved against the government and in favor of the taxpayer" and rejecting an interpretation that would "create[] a six-month black hole into which her refund disappears, a result that unreasonably harms the taxpayer and is not required by the statutory language" (citation modified)). In other words, by its plain terms, Section 7508A(d) requires the IRS to exclude the COVID-19 extension from its calculation of the plaintiff's refund, which necessarily includes its determination of the plaintiff's Section 6511(b)(2)(A) lookback period. Thus, the plaintiff's lookback period ran from June 14, 2018 to January 20, 2020, then from July 10, 2023 to about December 1, 2024, and Section 6511(b)(2)(A) does not bar her refund.

## CONCLUSION

For these reasons, the government's motion to dismiss is denied.

**SO ORDERED.**

s/Ann M. Donnelly
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
September 24, 2026